**[Cite as *Suever v. Schmidt*, 2022-Ohio-4451.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

CHRISTA N. SUEVER,

    PLAINTIFF-APPELLANT,             CASE NO.  1-22-14

    v.

BROCK R. SCHMIDT,                 O P I N I O N

    DEFENDANT-APPELLEE.

**Appeal from Allen County Common Pleas Court
Domestic Relations Division
Trial Court No.  2019 JP 13166**

**Judgment Affirmed**

**Date of Decision:  December 12, 2022**

**APPEARANCES:**

    *Thomas F. Meagher* **for Appellant**

    *Randy LaMarr, Jr.* **for Appellee**

**MILLER, J.**

{¶1} Appellant, Christa N. Suever, appeals the January 21, 2022 judgment of the Allen County Court of Common Pleas, Domestic Relations Division, designating defendant-appellee, Brock R. Schmidt, as the residential parent and legal custodian of the parties' minor child, L.S. For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Christa and Brock are the biological parents of a minor child, L.S., born in 2019. On November 13, 2019, the parties entered into a shared parenting plan. Under the plan, the parties were to alternate parenting time pursuant to a week-on, week-off schedule, or as the parents agreed.

{¶3} Subsequently, the relationship between the parties deteriorated, and on September 2, 2020, Brock filed a motion for a contempt citation against Christa, alleging that she refused to allow him to exercise parenting time in accordance with the shared parenting plan and did not allow him access to L.S.'s necessary medication. On October 1, 2020, Christa filed a response in opposition to Brock's motion.

{¶4} On October 2, 2020, Christa filed a motion to terminate the shared-parenting plan. In the motion, Christa requested the trial court terminate the shared parenting plan and name her the sole residential parent and legal custodian of L.S.

{¶5} On March 24, 2021, Brock filed a second motion for a contempt citation against Christa, alleging that she denied his parenting time on a number of occasions. Brock filed a third motion for a contempt citation on May 20, 2021, again alleging Christa continued to deny his parenting time on several occasions.

{¶6} That same day, Brock filed a motion to modify temporary orders.[1] In the motion, Brock sought a temporary order designating him the residential parent and legal custodian of L.S. On May 20, 2021, the guardian ad litem ("GAL") filed a request for the parties to complete forensic psychological evaluations. On May 25, 2021, Christa filed a response in opposition to Brock's motion to modify the temporary orders. In her supporting memorandum, Christa stated concerns that L.S. was being sexually abused while in Brock's care. Christa simultaneously filed a motion requesting the trial court order Brock to complete a drug and alcohol assessment and submit to a drug test. In her supporting affidavit, Christa alleged Brock "has a severe drinking issue that needs to be addressed." (Doc. No. 40).

{¶7} On that day, Christa also filed a motion to modify temporary orders. In her motion, Christa requested the trial court suspend Brock's parenting time until further notice due to Christa's allegations that L.S. was being sexually abused in his care. On May 26, 2021, Brock filed a response to Christa's motion to modify temporary orders and a motion for sanctions against Christa. In his supporting

---

[1] The parties' agreed temporary orders, filed March 10, 2021 stated that the week-on, week-off parenting schedule would continue for the pendency of the proceedings. (Doc. No. 25).

affidavit, Brock denied that L.S. was sexually abused in his care. Brock referenced medical reports which stated that the examining health care workers did not observe physical signs of sexual abuse when examining L.S. Brock also denied Christa's allegations that he struggles with substance abuse.

{¶8} On June 16, 2021, Christa filed a motion requesting an ex parte emergency order of custody. In her affidavit in support, Christa stated that an intruder broke into her home on May 29, 2021 and "shot at" her boyfriend. According to Christa, Brock was the "primary suspect" in the alleged incident. (Doc. No. 56).

{¶9} A new agreement for temporary orders was filed on June 23, 2021. In the agreement, the parties agreed to continue the week-on, week-off visitation schedule with a few minor changes relating to mid-week visitation, the right of first refusal, and the procedure for exchanges of the minor child.

{¶10} A final hearing on the pending matters, including Brock's three motions for citation in contempt and Christa's motion to terminate the shared parenting plan, was held on August 12, 2021. In a magistrate's decision filed on October 7, 2021, the magistrate found each of Brock's motions for citation in contempt to be well-taken and found Christa in contempt of court. The magistrate also found the motion to terminate the shared parenting plan well taken. Accordingly, the magistrate recommended that the court name Brock the residential

parent and legal custodian of L.S. The magistrate recommended Christa exercise parenting time via video conference for one hour on Wednesday evenings and one hour on alternating weekends. The magistrate stated that it would address the possibility of granting Christa in-person parenting time after Christa completes a psychological assessment and provides the recommended course of treatment to the court.

{¶11} On November 15, 2021, Christa filed her objections to the magistrate's decision. In her objections, Christa contended that the magistrate's decision was based upon two mistakes of fact. Specifically, Christa argued the magistrate erred by finding that she suffers from "several undiagnosed mental illnesses" and that there was no evidence presented as to the interrelationship between L.S., Christa, and her family. (Doc. No. 89). On November 24, 2021, Brock submitted his reply to Christa's objections, and Christa filed a response on October 8, 2021. On January 21, 2022, the trial court filed an order affirming the magistrate's decision.

{¶12} Christa filed a notice of appeal on February 22, 2022. She raises two assignments of error, which we address together.

**Assignment of Error No. I**

**The Trial Court erred in considering only the best interest of the child factors when O.R.C. 3109.04(E)(1)(a) requires that the trial court consider that a change in the circumstances of the child, or either of the parents subject to a shared parenting decree, and the modification is necessary to serve the best interest of the child.**

## Assignment of Error No. II

**The Trial Court's Judgment in Affirming the Magistrate's Decision was against the Manifest Weight of the Evidence and Contrary to Law, and amounted to an abuse of discretion, as terminating the November 2019, Share Parenting Agreement was not in the best interest of the minor child, [L.S.].**

{¶13} "'Decisions concerning child custody matters rest within the sound discretion of the trial court.'" *Krill v. Krill*, 3d Dist. Defiance No. 4-13-15, 2014-Ohio-2577, ¶ 26, quoting *Walker v. Walker*, 3d Dist. Marion No. 9-12-15, 2013-Ohi-1496, ¶ 46, citing *Wallace v. Willoughby*, 3d Dist. Shelby No. 17-10-15, 2011-Ohio-3008, ¶ 22 and *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "Accordingly, an abuse of discretion must be found in order to reverse the trial court's award of child custody." *Walker* at ¶ 46, citing *Barto v. Barto*, 3d Dist. Hancock No. 5-08-14, 2008-Ohio-5538, ¶ 25 and *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶14} "R.C. 3109.04 establishes the process for allocating parental rights and responsibilities between the parents of a minor child." *Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, ¶ 8. The shared parenting plan in the present case was adopted pursuant to R.C. 3109.04(D)(1)(a)(i), which relates to situations in which "both parents jointly make the request in their pleading or jointly file the motion and also jointly file the plan." In such situations, "[t]he court may terminate a prior

final shared parenting decree that includes a shared parenting plan * * * upon the request of one or both the parents or whenever it determines that shared parenting is not in the best interest of the children." R.C. 3109.04(E)(2)(c). Here, Christa requested the termination of the shared parenting plan, and the trial court determined that the termination was proper.

**{¶15}** At the onset, we note that, in her first assignment of error, Christa argues the trial court erred by only considering the factors relating to the best interest of the child and did not consider whether a change in the circumstances of the child occurred, rendering the modification necessary to serve the child's best interest.

**{¶16}** However, the Supreme Court of Ohio recently addressed this issue and distinguished the analysis required for modifying shared parenting plans and terminating a shared parenting plan. *Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, ¶ 8-13. The Supreme Court clarified that "a trial court is not required to find a change in circumstances, in addition to considering the best interest of the child, before terminating a shared-parenting plan and decree and designating one parent as the residential parent and legal custodian." *Id.* at ¶ 21. When the trial court terminates the shared parenting plan, it "shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of [R.C. 3109.04]

* * * as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d).

**{¶17}** Accordingly, contrary to Christa's argument, once the trial court terminated the shared parenting plan, it was not required to find a change in circumstances. Thus, Christa's first assignment of error is overruled.

**{¶18}** Having determined that the trial court was not required to find a change in circumstances, we next address Christa's argument that the trial court abused its discretion by affirming the magistrate's decision naming Brock as L.S.'s residential parent and legal custodian.

**{¶19}** R.C. 3109.04(F)(1) provides as follows:

In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companion rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶20} Additionally, when determining whether shared parenting is in the best interest of the child, the trial court must consider R.C. 3109.04(F)(2), which states that:

> [T]he court shall consider all relevant factors, including, but not limited to the factors enumerated in [R.C. 3109.04(F)(1)], and all of the following factors:
>
> (a)   The ability of the parents to cooperate and make decisions jointly, with respect to the children;
>
> (b)   The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
>
> (c)   Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
>
> (d)   The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;
>
> (e)   The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

{¶21} Our review of the record indicates that the trial court engaged in a detailed analysis of each of the required factors that was supported by the testimony adduced at the final hearing.

*R.C. 3109.04(F)(1)(a)*

{¶22} With respect to R.C. 3109.04(F)(1)(a), the trial court found that Christa and Brock both wish to be designated as the sole residential parent and legal custodian of the child. (Doc. No. 111). Indeed, at the final hearing, both parties

expressed a desire to be named the sole residential parent and legal custodian of L.S. (Aug. 12, 2021 Tr. at 57, 106, 220-221, 224).

*R.C. 3109.04(F)(1)(b)*

**{¶23}** Due to L.S.'s age, there was no in camera interview conducted of the child. (Doc. No. 111).

*R.C. 3109.04(F)(1)(c)*

**{¶24}** With respect to R.C. 3109.04(F)(1)(c), the trial court found as follows:

It appears that [L.S.] interacts positively with each of the parties.

Christa has a close relationship with her daughter by her own testimony and that of Christa's mother as well. Brock indicates that he has a close relationship with [L.S.], but that relationship has been affected by Christa's constant interference and denial of parenting time. Brock's mother also indicates that Brock is a good dad and has a good relationship with [L.S.]. Both of the grandmothers indicate they too have valued relationships with [L.S.], however once again, the paternal grandmother indicates that relationship has been affected by Christa's actions to deny time with [L.S.].

It was noted that Christa has a significant other that has two children, however there was extremely minimal testimony as to the relationship of Christa's significant other and his two children with [L.S.].

(Doc. No. 111).

**{¶25}** The testimony presented at the final hearing mirrors the trial court's findings. Glenna Schmidt, Brock's mother, testified that she has a "very good" relationship with L.S. and enjoys reading books and playing together. (Aug. 12, 2021 Tr. at 36-37). However, Glenna also testified that Christa routinely denies

Brock parenting time, and that Glenna went several months without seeing L.S. due to Christa's actions. (*Id.* at 37, 41-43). Glenna also described Brock as a "good dad" and stated that she has never seen Brock act in a way that is detrimental to L.S. (*Id.* at 44, 47). Brock testified that he has a good relationship with L.S. but that Christa's interference with the custody has affected their relationship. (*Id.* at 70, 106).

**{¶26}** Christa testified that he loves her daughter and misses her deeply when she is with Brock. (*Id.* at 186). Christa's mother, Patricia Mingle, testified that Christa "adores" L.S. (*Id.* at 162). Mingle stated that she does not believe Brock "adores" L.S. because when Christa and Brock ended their relationship, Brock was not involved with L.S. for a period of time. (*Id.* at 163). Mingle denied that Brock's absence in L.S.'s life during that period was due to Christa denying him parenting time. (*Id.*).

*R.C. 3109.04(F)(1)(d)*

**{¶27}** The trial court found that L.S. "is not in school and is in the same general geographic community, whether in the home of Christa or Brock." (Doc. No. 111). This finding was supported by the parties' testimony.

*R.C. 3109.04(F)(1)(e)*

**{¶28}** The trial court made the following findings with respect to R.C. 3109.04(F)(1)(e):

> There was no indication of any problems with the physical health of Christa, Brock, or [L.S.]. The Guardian Ad Litem did reference questions she had as to the mental health, but there have been no professional or expert opinions with regard to the mental health of any party. Christa alleges Brock has some dependence upon alcohol, but once again, there was nothing presented by way of evidence to indicate this is accurate. There was reference to Brock having convictions for a previous OVI and a physical control, however again, no evidence of alcohol dependency or other abuse diagnosis.

(Doc. No. 111).

{¶29} No testimony was presented regarding the physical health of Christa or Brock. Many individuals testified that L.S. is allergic to peanuts. As a result, she has a prescription for an EpiPen, which she must have with her at all times.

{¶30} The GAL requested a psychological evaluation of the parties due to concerns regarding attachment, alienation, and possible fictitious disorder. (Aug. 12, 2021 Tr. at 244). However, no professional or expert opinions were presented at the hearing regarding the mental health of either party.

{¶31} Christa testified that she believes that Brock has an "alcohol problem." (*Id.* at 185). Brock admitted that he has had two alcohol-related offenses in the past, specifically an OVI and physical control offense. (*Id.* at 63, 66). However, at the hearing, Brock denied having a substance abuse problem. (*Id.* at 63, 108). According to Brock, he attended a driver intervention program in June 2020, following his second alcohol-related offense. (*Id.* at 63-66). At the completion of the program, he was advised that he did not require further assessment, counseling,

or treatment. (*Id.* at 64-65); (Defendant's Ex. C). Brock stated that he no longer drives while under the influence of alcohol. (Aug. 12, 2021 Tr. at 109). Brock stated that he does not consume alcohol when L.S. is in his care. (*Id.* at 108-109). Glenna stated that she does not believe that Brock has a problem with alcohol. (*Id.* at 43).

{¶32} The GAL testified that she investigated Christa's concerns regarding Brock's use of alcohol. (*Id.* at 138). The GAL stated that aside from the two previously referenced alcohol-related offenses, she was not able to find evidence of Brock's continued use of alcohol. (*Id.* at 139). Additionally, during her visits to Brock's residence, including an unannounced visit, she did not observe alcohol in the home. (*Id.* at 149).

{¶33} Two employees at L.S.'s daycare stated that they had close contacts with Brock and never observed him acting impaired or smelling of alcohol. (*Id.* at 9, 21). Furthermore, the daycare has a policy forbidding them to release a child into a parent's care if the parent is intoxicated or impaired. (*Id.* at 10, 20-21). The daycare providers both stated that they never had a concern that resulted in them refusing to release L.S. to Brock. (*Id.* at 21).

{¶34} Additionally, in response to Christa's request for a welfare check, the Wapakoneta Police Department arrived at Brock's home unannounced. (*Id.* at 48). Brock invited the officer into his home, and the officer noted in his report that he

did not observe any alcohol in Brock's home, despite Christa's statement to law enforcement that she was concerned Brock was intoxicated. (*Id.* at 58-59, 202-203).

*R.C. 3109.04(F)(1)(f)*

**{¶35}** With respect to R.C. 3109.04(F)(1)(f), the trial court made the following findings:

> The Court believes that Brock will comply and abide by the Court approved parenting time rights, or visitation and companionship rights. The Court does not believe that Christa will abide by the Court orders and Christa has not abided by the Court's previous orders. The Court believes Christa will do whatever she wants to with regard to the child, and the record is replete with examples where Christa has defied the Court orders and conducted herself in a manner to negatively influence the relationship of [L.S.] and Brock. The Court believes this would continue in the future if Christa is given that opportunity.
>
> Christa has created a multitude of excuses as to why [L.S.] did not and should not accompany Brock for his visitation and companionship time, including but not limited to: [L.S.] not putting her coat on; allegations of sexual abuse; Christa fell asleep and did not get [L.S.] around for the visitation; that Christa's house was broken into (which she claims was performed by Brock); that Brock was not going to individually come and pick up [L.S.], but was going to have a friend of his assist because Brock had hit a deer and his car was inoperable; and the taking of a COVID test.
>
> An additional situation when Brock was using his days off on Monday and Tuesday to have time with [L.S.] when she was at Trinity Daycare is a good example of Christa's attitude toward that relationship as she withdrew [L.S.] from Trinity Daycare on those days so that Brock would not be able to exercise [parenting time] and have additional time with [L.S.].

> In short, Christa has gone to great efforts to try to negatively influence the relationship of Brock and [L.S.] and this Court believes would do so in the future.

 (Doc. No. 111).

**{¶36}** In May 2020, the parties began following a week-on, week-off parenting schedule with a midweek visitation. The parties also had the right of first refusal when the other party was unable to care for the child during their scheduled parenting time. Christa works Monday through Friday from 8:00 a.m. to 4:30 p.m. (Aug. 12, 2021 Tr. at 179-180). Brock works first shift on Wednesday through Sunday, and does not work on Monday and Tuesday. (*Id.* at 56).

**{¶37}** Brock testified he followed the visitation schedule outlined in the shared parenting plan "to a tee." (*Id.*). However, Brock stated that Christa has consistency denied him parenting time. Specifically, Brock alleges that Christa denied him parenting time for the weeks starting Sunday, August 16, 2020; October 25, 2020; November 8, 2020; December 6, 2020; December 20, 2020; January 3, 2021; January 17, 2021; January 31, 2021; February 14, 2021; February 28, 2021; and March 14, 2021. (*Id.* at 98-99); (Defendant's Exhibit G). Brock also claimed that Christa denied his mid-week parenting time on a number of occasions, including: December 30, 2020; January 13, 2021; January 27, 2021; February 10, 2021; February 24, 2021; November 25, 2020. (Aug. 12, 2021 Tr. at 98-99); (Defendant's Ex. G). Brock also alleges that on November 25, 2020, he brought

L.S. to Christa for her 3-hour midweek visitation and Christa refused to return L.S. to the remainder of Brock's scheduled parenting time. (Aug. 12, 2021 Tr. at 99); (Defendant's Ex. G).

{¶38} Brock testified that Christa cited a number of excuses for denying him parenting time including Christa falling asleep and not being awake to bring L.S. to him at the scheduled time, L.S. refusing to put on her coat, and Brock allegedly not being present at the exchange location. (Aug. 12, 2021 Tr. at 96, 102). Additionally, Christa accused Brock of sexually abusing L.S. and withheld parenting time from him on that basis. (*Id*. at 102). Christa also alleged that Brock broke into her home and attempted to shoot her boyfriend, and she denied Brock parenting as a result of her suspicions. (*Id*. at 102).

{¶39} Brock also described an instance when Christa refused to allow him parenting time because he allegedly did not have adequate transportation. (*Id*. at 102-103). According to Brock, he hit a deer with his vehicle, rendering it temporarily inoperable. (*Id.* at 103). So, Brock contacted a co-worker to install L.S.'s car seat in the co-worker's vehicle and drive Brock to Christa's home to pick up L.S. (*Id.*). However, when they arrived for the exchange, Christa did not allow Brock to pick up L.S. because he was not the one driving the vehicle. (*Id.*).

{¶40} Additionally, because Brock did not work on Mondays and Tuesdays, he attempted to pick up L.S. at daycare on those days so that he could spend time

with her in accordance to the parties' right of first refusal. (*Id.* at 99-100). However, according to Brock, once Christa learned that Brock attempted to exercise parenting time on his days off of work, she stopped sending L.S. to daycare on Mondays and Tuesdays so that he was unable to exercise his right of first refusal on those days. (*Id.* at 100).

{¶41} Brock stated that he would continue to honor any court-ordered visitation schedule and would facilitate visitation in accordance with the court order. (*Id.* at 106). However, Brock stated his concern that Christa would refuse to exercise a court-ordered visitation schedule because she has consistently failed to do so in the past. (*Id.*).

{¶42} For her part, Christa claims that she never denied Brock visitation, or if she did it was for "good reason." (*Id.* at 176, 205). For instance, Christa alleges that Brock would fail to show up at the exchange points, did not have adequate transportation, or sexually abused L.S. She also stated that she denied Brock visitation on one occasion because she did not receive the results of Brock and L.S.'s COVID-19 tests. (*Id.* at 190-191). Christa also recounted an occasion where she denied Brock visitation because L.S. refused to put on her coat and was violently acting out toward Christa. (*Id.* at 206-208).

{¶43} The GAL testified that Brock provided her with documentation to corroborate his claims that Christa denied him parenting time. (*Id.* at 126). For

instance, Brock provided the GAL with text messages from Christa stating that she did not drop off L.S. because she fell asleep. (*Id.*). In contrast, Christa did not provide the GAL with credible evidence to corroborate her claims that she was at the exchange point at the designated time. (*Id.* at 127). Christa did provide the GAL with GPS coordinates which Christa claimed demonstrated that she was present at the exchange locations at the designated time; however, when the GAL examined the GPS coordinates provided by Christa, the GAL noted that the GPS coordinates did not appear to be consistent with the exchange dates. (*Id.*).

*R.C. 3109.04(F)(1)(g)*

**{¶44}** The parties did not have a child support order, so neither parent failed to make required child-support payments. (Doc. No. 111); (Aug. 12, 2021 Tr. at 223).

*R.C. 3109.04(F)(1)(h)*

**{¶45}** The trial court made the following findings relating to R.C. 3109.04(F)(1)(h):

> There was no evidence that either parent or any member of either household had previously been convicted or plead guilty to any criminal offense involving a finding of a child being an abused or neglected child.
>
> The record is replete with allegations made by Christa against Brock, including those of sexual abuse, breaking into her home and stealing a key, being involved with a break-in where a gun was discharged within Christa's home and driving a vehicle while intoxicated with [L.S.] in his presence.

> There was absolutely no corroboration of these accusations and no evidence presented supporting the accuracy or truth of any of these allegations.

(Doc. No. 111).

**{¶46}** Brock and Christa both testified that no members of their household have been convicted of or plead guilty to a criminal offense involving a finding of a child being an abused or neglected child. (Aug. 12, 2021 Tr. at 221-222, 225). However, Christa did make a number of allegations against Brock, including that he sexually abused L.S., broke into her home and attempted to murder her, and drove intoxicated while L.S. was in the vehicle.

**{¶47}** At the final hearing, Christa testified she was suspicious that Brock had inappropriate sexual contact with L.S. "due to multiple incidents." (*Id.* at 211). Christa alleged that in January 2021, she began to notice "extreme behavior" from L.S. after she returned from Brock's care, including a strong aversion to having her diaper changed. (*Id.*). On one such occasion in May 2021, she took L.S. to the emergency room claiming she observed redness and blood in L.S.'s diaper area. (*Id.* at 173). However, Christa stated that the emergency room doctor did not examine L.S. (*Id.* at 174-175). Mingle, who was present with Christa and L.S. during the visit to the emergency room alleged that the emergency room doctor lied by reporting there were no signs of physical or sexual abuse. (*Id.* at 164-165). Christa

-20-

stated that it was her understanding that the medical staff would forward her concerns regarding the alleged abuse to CPS to open an investigation.

**{¶48}** Brock vehemently denied ever sexually abusing L.S. (*Id.* at 101). He stated that he learned about the accusations from his legal counsel and the GAL, at which point he reached out to the health care system to review the medical records and that his understanding was that the records did not indicate any kind of abuse. (*Id.* at 102). Furthermore, Brock was never contacted by CPS. (*Id.*). Brock opined that Christa fabricated the claims of sexual abuse to prevent Brock from seeing L.S. (*Id.*). Additionally, the director of Trinity Daycare testified that, based on her experience working in childcare, she does not believe that L.S. showed signs of abuse. (*Id.* at 23).

**{¶49}** The GAL testified that when she was informed of the sexual-abuse allegation, she conducted a thorough investigation of the matter. (*Id.* at 123-124). The GAL reviewed the medical records from the hospital and L.S.'s pediatrician and noted that the medical records denoted there were no findings of sexual abuse. (*Id.* at 123). GAL also contacted CPS and learned that the agency determined that the incident did not meet the criteria for opening an investigation. (*Id.* at 124). Additionally, the GAL conducted an unannounced visit to Brock's home following the sexual abuse allegations. During this visit, she observed Brock change L.S.'s diaper and noted no concerns, including behavioral concerns. (*Id.* at 105, 142).

{¶50} Christa alleged that someone attempted to murder her. (*Id.* at 214-215). Specifically, Christa alleged that in June 2021, she and her boyfriend were in her bedroom when they heard a door broken in. (*Id.* at 215). When her boyfriend ran to investigate, the intruder shot at her boyfriend. (*Id.*). It was Christa's opinion that, whoever came to her house that night came with the intention of murdering her. (*Id.* at 215-216). Furthermore, Christa believed that Brock was the alleged intruder who discharged a gun in Christa's home. (*Id.* at 215).

{¶51} However, Detective Matt Boss with the City of Lima Police Department who was investigating the incident, stated that they have no suspects in the case. (Aug. 12, 2021 Tr. at 28-29, 32). Detective Boss testified that Brock voluntarily came to the police station for an interview following the incident and he has no reason to believe that Brock was dishonest during the interview. (*Id.* at 31). Furthermore, Detective Boss stated that the only reason that Brock was brought into the investigation was due to Christa's suspicion. (*Id.* at 34). Detective Boss testified that they are exploring all possibilities, including the possibility that Christa and her boyfriend "set this up." (*Id.*).

{¶52} Christa also alleged that Brock attempted to break into her garage in May 2021. (*Id.* at 210). Christa stated that a key was missing from her home and nobody other than Brock would have had access to the key. (*Id.*). Christa testified

that a neighbor apparently observed Brock attempting to get into her garage, but neither she nor the neighbor reported the incident to the police. (*Id.* 210-211).

**{¶53}** Finally, Christa alleged that Brock abused alcohol, including when L.S. was in his care. The testimony related to those allegations were outlined in detail in our decision of the testimony relating to R.C. 3109.04(F)(1)(e).

*R.C. 3109.04(F)(1)(i)*

**{¶54}** With respect to R.C. 3109.04(F)(1)(i), the trial court made the following findings:

> Christa has continuously and willfully denied Brock his right to parenting time and has tried to negatively interfere with that parenting time.
>
> In addition to the examples cited earlier and the findings of contempt for denial of parenting time, which were made by the Magistrate and not subject to objections by Christa, one of the most egregious factual situations presented was Christa's treatment of the EpiPen for [L.S.].
>
> [L.S.] has severe peanut allergies. In fact, the maternal grandmother indicates the reason Christa placed a tracking device in the diaper bag to be used by Brock for [L.S.] was so that Christa could know where [L.S.] was going out of concern for her peanut allergies.
>
> Christa had presented Trinity Daycare with the EpiPen, which Brock wanted to get when he took [L.S.] with him from the daycare so that he had an EpiPen in case [L.S.]'s severe allergies were somehow triggered. Christa indicated to Trinity Daycare that they were prohibited from giving Brock the EpiPen and the management at Trinity, by testimony, indicated they gave Brock the EpiPen, as it was necessary and part of their protocol so that they did not release a child knowing the child had severe allergic reactions without appropriate medication to save the child's life if necessary.

> Brock took steps to get a prescription to get EpiPens for himself to have for [L.S.], however Christa took [it] upon herself to cancel the prescriptions at the CVS Pharmacy.
>
> The appearance is that Christa believes that by not allowing Brock to properly have the medication necessary to have [L.S.] in his care that she could somehow prevent that from occurring.
>
> Christa testified there are only so many of the EpiPens available for over a course of a year, however acknowledged that they were good for six (6) months or a year. The prescriptions gave access for eight (8) EpiPens.

(Doc. No. 111).

{¶55} At the final hearing, Brock presented an abundance of testimony relating to Christa's attempts to interfere with Brock's parenting time. We detailed much of this testimony in our discussion of other factors, and we will not duplicate those efforts here.

{¶56} In addition to the testimony previously discussed, the parties also addressed several incidents related to L.S.'s EpiPen. According to Brock and Christa, L.S. is allergic to peanuts and has a prescription for an EpiPen. The parties stated that it is important for L.S. to have an EpiPen with her at all times to be administered in the event that her peanut allergy is triggered.

{¶57} Brock did not have an EpiPen of his own at Christa's insistence, but had access to the EpiPen that was contained in the parties' shared diaper bag. However, in August 2020, Brock and Glenna found a tracking device in the shared diaper bag. (Aug. 12, 2021 Tr. at 40-41, 72-73). Christa admitted at the hearing

that she placed the tracking device in the diaper bag without Brock's knowledge or consent. (*Id.* at 186-188). According to Christa's mother, Christa placed the tracking device in the diaper bag so that she could monitor if L.S. was near peanuts. (*Id.* at 166). After finding the tracking device, Brock told Christa that he no longer wanted to share a diaper bag with her. (*Id.* at 70).

{¶58} Brock contacted L.S.'s doctor and requested the pharmacy fill a prescription for an EpiPen. (*Id.* at 70-71). However, the pharmacy called Christa when the EpiPen prescription was ready to be picked up, and Christa cancelled the prescription. (*Id.* at 198). Accordingly, when Brock arrived at the pharmacy to pick up the prescription, he was informed that the EpiPen prescription had been cancelled. (*Id.* at 71).

{¶59} Christa admitted that she cancelled the EpiPen prescription that Brock called in because L.S. had eight EpiPen refills, each containing a set of two EpiPens, to last the year and she did not want to "waste" a prescription by allowing Brock to have a set of EpiPens in his possession. (*Id.* at 194-195).

{¶60} Shortly after discovering the tracking device in the diaper bag, Brock arrived at Trinity Daycare to pick up L.S. (*Id.* at 71). Because Brock did not have an EpiPen for L.S., the daycare staff sent L.S.'s EpiPen with Brock. (*Id.*). Christa had informed the daycare that they were not to release the EpiPen to Brock since it was "her property," however, the daycare staff determined that the EpiPen was

important for L.S.'s safety and they released the EpiPen to Brock against Christa's orders. (*Id.* at 11-12).

**{¶61}** Christa admitted that when she learned that the daycare sent the EpiPen with Brock, against her expressed wishes, she became very upset. (*Id.* at 22). The daycare director testified that following the EpiPen incident, Christa called and yelled at her. (*Id.* at 22-23). According to the daycare director, Christa accused the daycare of "stealing" the EpiPen by releasing it to Brock. (*Id.* at 22). Christa also unenrolled L.S. from the daycare based on the incident. (*Id.* at 192). According to Brock, Christa also called the Wapakoneta Police Department and accusing him of stealing the EpiPen and the clothes that L.S. was wearing at the time of the drop off. (*Id.* at 58). Brock also testified that it was actually his insurance that paid for the EpiPens that Christa claimed were her property. (*Id.* at 72). Further, the EpiPen was prescribed to L.S., not Christa. (*Id.* at 22).

*R.C. 3109.04(F)(1)(j)*

**{¶62}** In accordance with the parties' testimony, the trial court found that neither party planned on establishing a residence outside of Ohio. (Doc. No. 111); (Aug. 12, 2021 Tr. at 223-224).

*R.C. 3109.04(F)(2)*

**{¶63}** The trial court also examined the factors in R.C. 3109.04(F)(2) and found as follows:

A.    These parties have absolutely no ability to cooperate and make joint decision with respect to [L.S.].

B.    Christa has not demonstrated the ability to encourage the sharing of love, affection and contact between [L.S.] and Brock. Brock has complied with the orders of the Court but the Court is unsure as to whether that ability is or is not present after the tumultuous and extended relationship of these parties with respect to [L.S.].

C.    There was no indication of history of or potential for abuse, absent the allegations the Court has previously acknowledged made by Christa. It would also be noted under this section that Christa has inquired of police regarding charges for interference with custody with respect to a time that Brock picked [L.S.] up from Trinity that Christa did not believe was in conformance with the orders.

D.    The parties would be in a geographic proximity that would accommodate shared parenting.

E.    The Court has reviewed the recommendations of the Guardian Ad Litem who indicates that shared parenting is not in the best interest of [L.S.] and it is in [L.S.]'s best interests to designate Brock as the residential parent and legal custodian of [L.S.].

(Doc. No. 111).

{¶64} After reviewing the trial court's findings with respect to R.C. 3109.04(F)(2), we find that the trial court's findings are supported by the evidence presented at the final hearing.

*Analysis*

{¶65} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Pallone v. Pallone*, 10th Dist.

Franklin No. 17AP-409, 2017-Ohio-9324, ¶ 37. After reviewing the trial court's findings in conjunction with the evidence presented at the final hearing, we do not find that the trial court abused its discretion by terminating the shared parenting plan and naming Brock the residential parent of L.S. because, as previously detailed, the findings were supported by competent, credible evidence.

{¶66} The parties agree that they are not able to cooperate and make joint decisions, and both parties requested the termination of the shared parenting plan. With respect to the trial court's decision to name Brock the residential parent of L.S., the evidence was clear that Christa went to great lengths to interfere with Brock's parenting time, including making serious, unsubstantiated claims of sexual abuse. Additionally, the extreme measures that Christa was willing to take to undermine Brock's ability to exercise parenting time, including attempting to deny him access to L.S.'s needed medication are troubling. On the other hand, Brock indicated a willingness to abide by the court order and demonstrated that he has attempted to do so, despite Christa's lack of cooperation.

{¶67} Accordingly, after reviewing the record, we do not find that the trial court erred by terminating the parties' shared parenting plan and naming Brock the residential parent of L.S.

{¶68} Nonetheless, Christa argues that the trial court abused its discretion by adopting the magistrate's decision for several reasons. First, Christa alleges that the

trial court's finding is against the manifest weight of the evidence because the magistrate inappropriately relied on the GAL's speculation that Christa suffers from several undiagnosed mental health disorders, including attachment and alienation disorders and fictitious disorder. We disagree.

{¶69} In the magistrate's decision, the magistrate did state as follows:

The Guardian Ad Litem has suggested that Christa suffers from fictitious disorder. The undersigned would agree though the undersigned does not have a degree in psychology, it appears that the evidence demonstrates she is exhibiting general behaviors of this disorder. Further, the undersigned believes that Christa may suffer from other undiagnosed mental health issues.

(Doc. No. 77).

{¶70} Indeed, at the final hearing, the guardian ad litem requested that the magistrate order a psychological evaluation. (Aug. 12, 2021 Tr. at 244). In response to the trial court's request for clarification, the GAL stated that she was concerned regarding "attachment [and] alienation" and "possibly fictitious disorder."[2] (*Id.*).

{¶71} However, pursuant to Civ.R. 53(D)(4)(d), following Christa's objection to the magistrate's decision, the trial court conducted an independent review of the issue. In the trial court's judgment entry affirming the trial court's decision, the trial court stated, "The Guardian Ad Litem did reference questions she had as to the mental health, but there have been no professional or expert opinions

---

[2] We note that the guardian ad litem did not specify that her concerns related to Christa. However, based on the context and in light of the testimony presented at the hearing, it appears that the guardian ad litem's concerns could only relate to Christa.

-29-

with regard to the mental health of any party." (Doc. No. 111). Thus, although the trial court did mention the concerns regarding mental health, the trial court did not specifically reference either party nor did the trial court reference the specific mental health disorders mentioned by the guardian ad litem. Accordingly, it appears that the trial court noted that the guardian ad litem expressed general concerns, but properly noted that the record contains no professional or expert opinions regarding the mental health of any party. Thus, we find Christa's argument relating to the magistrate's findings regarding Christa's mental health to be without merit.

{¶72} Second, Christa argues that that the trial court's decision to terminate the shared parenting plan and name Brock the residential parent of L.S. was against the manifest weight of the evidence because "the trial court incorrectly concluded that there was 'no evidence presented as to the interrelationship between the Appellant, her daughter, and Appellant's family.'" (Appellant's Brief at 8). Once again, we note that Christa's argument relates to the magistrate's finding of facts and recommendations rather than the trial court's independent review of the issue pursuant to Civ.R. 53(D)(4)(d). Indeed, in the magistrate's decision, the magistrate noted:

> There was very limited testimony with regards to [L.S.]'s relationship with Christa. Most of Christa's testimony was accusatory towards Brock. Christa is the current primary residential parent but no one presented evidence as to her relationship with the child. It cannot be assumed that her relationship is appropriate with the child. It is a concern that she has subjected the child to a medical exam by falsely

accusing the father of sexual abuse. There was no evidence presented
by Christa as to her relationship with [L.S.]. It is known that her
mother, [Mingle] has babysat [L.S.] but the frequency has not been
stated.

(Doc. No. 77).

{¶73} However, following its independent review of the issue pursuant to

Civ.R. 53(D)(4)(d), the trial court stated in its judgment entry that "Christa has a

close relationship with her daughter by her own testimony and that of Christa's

mother as well." (Doc. No. 111). Accordingly, it appears that the trial court *did*

consider the testimony given by Christa and her mother relating to Christa's

relationship with L.S. Furthermore, based on this testimony, the trial court found

that that Christa and L.S. have a "close relationship."

{¶74} Christa's argument on appeal alleges that the trial court did not

consider the "testimony" of Christa's stepfather, father, and other friends and

family. (Appellant's Brief at 9). However, only Christa and her mother testified on

Christa's behalf at the final hearing. It appears that the other "witnesses" and

"testimony" that Christa references in her appellate brief relate to statements several

members of Christa's family made to the GAL. The statements Christa references

are contained in the GAL's report, which is part of the record in the case. However,

the individuals did not testify at the final hearing. Accordingly, we find Christa's

argument without merit.

{¶75} Christa's second assignment of error is overruled.

**{¶76}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas, Domestic Relations Division.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**